

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00143-CR

———————————————

JOHN TUFTS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F18-3014-211

---

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant John Tufts appeals his three convictions for injury to a child. In six issues, Tufts argues that (1) the evidence is insufficient to support the jury's verdict of injury to a child by omission causing serious bodily injury; (2) the evidence is insufficient to support the jury's verdict of injury to a child by contact; (3) the trial court abused its discretion by finding the complainant child in this case, Madison,[1] competent to testify; (4) the trial court abused its discretion by allowing a witness to testify regarding what Madison had told the witness; (5) his double jeopardy rights have been violated; and (6) the trial court abused its discretion by ordering that two of his sentences run consecutively. We affirm.

## II. BACKGROUND

### A. Madison's Upbringing in Poland

This case stems from injuries that Madison sustained on August 9, 2016. About one month after Madison was born, she was placed in a foster home in Poland as a result of parental abuse and neglect. Approximately a year later, her birth mother had Mia, who was immediately removed from her birth parents and placed in the same

---

[1]Because the complainant in this case was a minor at the time the offenses charged were committed, we use aliases when possible throughout this opinion to protect her identity. *See* Tex. R. App. P. 9.10(a)(3); 2nd Tex. App. (Fort Worth) Loc. R. 7.

Polish foster home as Madison. Madison and Mia lived in the foster home with six to seven other foster children, all of whom were under the age of four.

The environment within the foster home was not a warm one, and Madison and Mia did not receive a great deal of caring attention from the adults who were operating the home. As a result, they were not exposed to much physical or sensory stimulation, which led them to acquire certain developmental deficiencies, such as being overstimulated by ordinary sounds in the world outside the foster home and having low muscle tone, which caused both children to experience significant difficulties with walking and other motor skills. And because the caretakers of their foster home were all female, Madison and Mia were hesitant and standoffish toward males.

Madison had also developed certain behavioral issues. Those issues included experiencing high anxiety and throwing tantrums whose severity went beyond the norm for a child of her age. In addition, Madison had taken on an unhealthy "parentified" role toward Mia, which meant that given the neglectful environment in which they were living, Madison had assumed the role of protecting and caring for Mia, and she would challenge any adult who tried to take on those responsibilities. Madison also routinely engaged in masturbation, a behavior that is apparently common in children from the kind of neglectful background that Madison and Mia had experienced.

## B. Madison's Unusual Adoption

Shortly before Madison was born, Amy and Glenn, who lived in Utah with their three boys, decided they wanted to add to their family by adopting a child. Amy and

3

Glenn wanted to adopt a girl, and they eventually decided to pursue an international adoption, focusing specifically on adopting a child out of Eastern Europe. They connected with European Adoption Consultants (EAC), an adoption agency that had adoption programs in several countries, including Poland.

Although they had originally indicated that they sought to adopt only one child, Amy and Glenn's consultant at EAC contacted them in 2015 to ask whether they would be willing to adopt two children. Initially, Amy and Glenn were not interested, as they did not believe they could handle adopting more than one child given that they already had three children. But when the adoption consultant gave them some information about the two children, they decided to move forward with the process to see if the children might be a good fit for their home. Those two children were Madison and Mia.

Amy and Glenn traveled to Poland, got a temporary apartment, and met Madison and Mia. For a few weeks, Madison and Mia lived with Amy and Glenn at their temporary apartment. In total, Amy stayed in Poland for about six weeks, while Glenn took a two-week break during that period to return home and check on their three children. While they were in Poland, Amy and Glenn noticed that Madison and Mia exhibited the general developmental deficiencies and behavioral issues described above.

Relevant to this case, Amy and Glenn were able to observe Madison's intense tantrums, her "parentified" relationship with Mia, and her self-stimulation. The tantrums were difficult for Amy and Glenn to manage. For example, whenever they

4

would walk around the city with Madison and Mia, Madison would fall to the ground and purposely urinate. And when Madison threw herself to the ground during a tantrum, she would sometimes sustain bruises to her lower legs. At times, Madison would try to get out of a moving car, and Amy and Glenn would have to physically restrain her. Madison would also scream at the top of her lungs, often for hours at a time. These tantrums sometimes led Amy and Glenn to cut their outings short and return to their apartment.

Regarding Madison's self-stimulation, Amy and Glenn had learned from their adoption classes that this behavior was common in children who had been neglected. In Madison's case, Amy and Glenn observed that she generally engaged in that behavior at night before bed and in the morning after she awakened. They also noted that she would do so in a particular way: she would lie face down on the bed, place her hands by her genitals outside of her clothing, and gently rub. Neither Amy nor Glenn ever saw Madison insert an object inside of her genitals while masturbating.

As their time with Madison and Mia progressed and they experienced Madison's challenges first-hand, Amy and Glenn began to question whether they would be able to provide the level of care and support that Madison would need in order to thrive, which led them to grow concerned about whether they would be able to adopt both Madison and Mia. Amy and Glenn then took the children to see a doctor, something that was part of the international adoption process. The doctor performed a physical examination of both girls, which did not reveal signs that either girl had suffered abuse

5

of any kind. Amy and Glenn talked to the doctor about Madison's behavioral issues. The doctor informed them that in cases like Madison's, in which a child has assumed a "parentified" role over a sibling, it was not uncommon to place the children in separate homes.

Amy and Glenn ultimately decided that although they wanted to proceed with adopting Mia, they would be unable to care for Madison. They contacted the adoption agency they were working with in Poland to find out what their options were and learned that they would either have to adopt both children or leave both of them in Poland. Amy and Glenn did not want to leave the girls in Poland, and they believed that both girls would live better lives in the United States. So they decided to adopt both girls. But in doing so, they continued to believe that because of the challenges posed by Madison's behavioral issues, it would ultimately be better for her to be placed in another adoptive home.

Based on the advice of the adoption workers in Poland, Amy and Glenn moved forward with adopting Madison and Mia but did not inform the Polish legal authorities involved in the adoption that they intended to have another family adopt Madison after they returned to the United States. Amy and Glenn additionally contacted EAC to find out whether the agency was aware of any family in the United States that would be a good fit for Madison and would be available to adopt her from them upon their return to the United States. They were provided with three families who were available to take Madison in the United States.

One of those families was Tufts and his then-wife, Gabby, who at the time had a single, four-year-old child, Taryn. Amy and Glenn ultimately chose to have Madison placed with them. After selecting Tufts and Gabby, Amy and Glenn learned that Tufts's mother, Diana, happened to work for EAC in South Carolina. While Amy and Glenn never spoke to Tufts or Gabby, they did speak with Diana and told her about the issues they had been having with Madison. Diana then informed Tufts and Gabby that a little girl might be coming to the United States who would be placed with them. About two weeks later, Amy and Glenn, with newly adopted Madison and Mia in tow, started their journey from Poland back to Utah.

On the way back to Utah, they stopped at the Dallas/Fort Worth International Airport, landing there on July 4, 2015. They were met in the baggage claim area by Diana, another person who was a notary, and, unbeknownst to them, Gabby. Diana and Gabby took Madison aside to distract her, and the notary took Amy and Glenn to a different area to sign paperwork. After the paperwork was signed, Amy, Glenn, and Mia went back inside the airport terminal to board their connecting flight to Utah.

Diana and Gabby left the airport with Madison and a small backpack that Amy and Glenn had provided for Madison. Among other items, the backpack had a journal inside, in which Amy had written information about what they had learned about Madison during their time in Poland. Madison was four years old at the time.

Tufts and Gabby were given only about two weeks' notice that Madison might be placed in their home. At that point, they had not gone through the typical process

for such placements: they had not been adequately vetted, had not received training, had not undergone a home study, and had not established post-placement supervision. But by February 2016, they had undergone a home study, had taken appropriate steps to accomplish a domestic adoption of Madison, and had formally adopted her.

## C. Madison's Presence Leads to Stress in the Tufts's Home

In the immediate aftermath of Madison's July 4, 2015 placement with Tufts and Gabby, she appeared to be doing well. But her behavior deteriorated over time, and Tufts and Gabby found her more difficult to manage. Allegedly, Madison began acting out and throwing intense tantrums, including tantrums that sometimes involved being physically aggressive toward Taryn.

Gabby worked at a boutique a couple of days a week, and her hours were generally from 4:00 p.m. to 9:00 p.m. While she was at work, Tufts would watch Taryn and Madison. On several occasions when Gabby left for work, Madison would seem fearful of Tufts. There were also times that Gabby would return home from work after Madison had gone to bed, and then the next morning she would discover that Madison had an injury. Those injuries included a black eye or a fattened lip. Gabby assumed these injuries were occurring because Madison was running into something in her room at night, such as her nightstand.

A couple of months before they finalized their adoption of Madison in February 2016, Tufts and Gabby told Gabby's sister, Xenia, that assimilating Madison into their family had been more difficult than they had expected and that it had been an expensive

8

and stressful endeavor. In addition to their difficulties managing Madison, Tufts and Gabby had financial trouble, Gabby went through some health challenges, and Tufts and Gabby's marriage relationship became strained. The cumulative stress in the couple's home became concerning to Xenia, so a short time before Tufts and Gabby finalized their adoption of Madison, Xenia offered to help them by keeping Madison for some time and essentially co-parenting her with them. And to help alleviate the strain Tufts and Gabby were under, Xenia also offered to share with them the expenses related to raising Madison.

As their time with Madison progressed, Tufts and Gabby gradually grew more frustrated with her. In July 2016, Tufts reached out to Dr. Michele Greer, a psychotherapist whose practice focused on treating children with certain behavioral issues. On July 28, 2016, Tufts and Gabby met with Greer and explained the difficulties they were having with Madison.

According to Greer, the main reason Tufts and Gabby came to see her was "[t]hat the child was having trouble following directions, was being what they considered oppositional, that she would zone out and shut down when given instructions, [and] that she was masturbating and having some other acting-out behaviors with the parents." They told Greer that Madison had been diagnosed with reactive attachment disorder and that Madison would try to get attention by purposefully hurting herself by banging her head or throwing herself to the ground.

9

Tufts and Gabby further mentioned that Madison had been masturbating "all the time," and they said that they had been taping her hands at night when she was in bed to prevent her from doing so. Greer did not specialize in treating children with reactive attachment disorder, so she made it clear to Tufts and Gabby she would not be able to treat Madison, and it would be better for her to see a specialist. Greer did, however, offer to counsel Tufts and Gabby, so the couple scheduled a follow-up appointment.

In May 2016, Diana had decided to move to Texas to help Tufts and Gabby take care of Madison. By June 2016, Diana had purchased a house nearby, and by August 2016, she was preparing to move to Texas. Diana planned to have completed her move to Texas by mid-August.

## D. August 9, 2016: Madison is Injured

Although Greer had indicated that she would not be able to treat Madison and had referred her to a specialist, Tufts called Greer's office several times on August 9, 2016, and spoke with her office coordinators. Tufts told them that Madison's behaviors had escalated and that she had been hurting herself.

Around 3:30 p.m. that afternoon, Gabby went to work, leaving Tufts to take care of Taryn and Madison. Sometime later, while she was still at work, Gabby called Tufts to check on the girls. According to Gabby, Tufts sounded frazzled and shocked, telling Gabby that Madison had gotten hurt and that he would have to call her back.

10

At around 7:17 p.m., Tufts called Diana and sounded panicked. He told Diana that he had been giving Madison a bath and had left to go check on Taryn, who was showering in another bathroom. Tufts said that when he came back to check on Madison, she had stuck an Elsa[2] doll in her vagina. And he told Diana that Madison appeared to be zoned out and that there was blood in the bathtub. Diana reported to a CPS worker that Tufts had said that he removed the doll from Madison's vagina, but at trial, Diana averred that she had not reported that. Diana asked Tufts to send her a picture of the doll, and he texted a picture to her. When Diana saw the picture, she told Tufts to call Gabby and to then take Madison to the emergency room.

A little while later, Tufts texted the photograph he had taken of the doll to Gabby. The photograph showed the legs of a doll, and the legs had blood on them. Gabby called Tufts and asked him what had happened, and Tufts told her that Madison had hurt herself with her Elsa doll. Tufts elaborated, stating that Madison had been in the shower, that he had gone in to check on her, and that when he did, he found that the doll was stuck inside of her vagina.

Tufts told Gabby that Madison was doing okay. At trial, Gabby told the jury that later that evening, she returned home, went to Madison's bedroom, and opened the bedroom door. She saw that Madison was asleep, and because Tufts had told her

---

[2]The record reflects that Madison had a Barbie doll modeled after Elsa, a character in the Disney film *Frozen*.

11

that Madison was no longer bleeding, Gabby did not want to wake her. So Gabby left Madison sleeping.

## E. August 10, 2016

The next morning, Tufts went to work, while Gabby remained home with Taryn and Madison. Gabby noticed that Madison was in pain, and Madison told Gabby that she did not feel well. Still, Gabby did not check the injured area. But she did notice that there was a blood stain on Madison's panties. So Gabby got a clean pair of panties for Madison, placed a panty liner inside, and put them on Madison. According to Gabby, she added the panty liner so that she could see if any further discharge came from Madison's injury, and if it did, she could arrange for Madison to see a doctor. Additionally, because Madison had complained that she was in pain, Gabby gave her Tylenol. Tufts called Gabby to check in, and Gabby told him about the blood on Madison's panties.

*Tufts's Interactions with Dr. Amy Curtis*

At some point after Madison was injured on August 9, 2016, and before the early afternoon of August 10, 2016, Diana contacted Dr. Amy Curtis, who was the director of counseling at Buckner Children & Family Services, stating that EAC had placed a child in the Dallas/Fort Worth area and that she needed emergency assistance with that family. Diana was acquainted with Curtis because they had previously worked together at an adoption agency in Fort Worth. When Curtis returned Diana's call, Diana told her that Madison had been masturbating to the point of bleeding. Curtis expressed that

12

she was willing to assist with counseling regarding the situation but that Tufts would have to contact her. Curtis also related to Diana that the incident would need to be reported to Child Protective Services (CPS).

Curtis received a phone call from Tufts, who spoke with a sense of urgency. Tufts told Curtis that Madison had been sexually abused in Poland, that she reported that she had slept in a cage in Poland, and that people had done bad things to her in Poland. Tufts also told Curtis that Madison had been masturbating and that he had not been able to stop her from doing so. He also referenced the August 9, 2016 incident with the doll, indicating that Madison had been masturbating in the bathtub to the point of bleeding. Tufts asked Curtis to provide counseling services to Madison.

Following her phone conversation with Tufts, Curtis sent him a text message at approximately noon that outlined the counseling plan they had established. Tufts responded with a text message asking a question related to the billing for Curtis's services. These messages set off a series of messages between Tufts and Curtis that lasted a few days. In the messages, Tufts indicated to Curtis that Madison was actively bleeding from her injuries and that he had delayed taking Madison to the hospital. Curtis said that she found the content of Tufts's texts concerning because it appeared to her that Tufts was more concerned with how Madison's injuries impacted him rather than seeking medical care for her and that when medical care was in fact sought, Tufts expressed his own concerns over how CPS and authorities might perceive him. According to Curtis, Tufts also seemed to be building a defense for himself because he

13

continually referenced abuse that allegedly occurred to Madison in Poland. Curtis reported the content of her calls and texts to CPS.

*Tufts's Interactions with Dr. Susan Torrie*

Tufts and Gabby had established pediatric care for Madison at one of Cook Children's pediatric offices in Denton a few months after she had been placed with them in July 2015. At approximately 2:30 p.m. on August 10, 2016, Tufts called the pediatrician's office and stated that Madison had inserted a doll into her vagina and rectum, that she had been bleeding for several hours, and that she had been complaining of pain. Tufts also related that Madison had an extensive history of sexual abuse when she lived in Poland. Dr. Susan Torrie, a pediatrician at the office, referred Madison to the Cook Children's or Dallas Children's emergency room. Tufts stated that he was going to call Gabby to find out whether she wanted to take Madison, and he said that he would let Torrie's office know which emergency room was chosen once that decision had been made.

Tufts called Torrie's office again at approximately 4:30 p.m. and stated that Madison's bleeding had stopped and that instead of going to the emergency room, he wanted to bring Madison in for a checkup at the pediatric office the following day. Torrie scheduled an appointment for Madison for 1:25 p.m. on August 11, 2016, but she told Tufts to take Madison to the emergency room if the bleeding resumed. Tufts voiced his understanding, and he also commented to Torrie that he thought it would look better if Gabby brought Madison to the appointment instead of him.

14

*Tufts's Further Interactions with Dr. Michelle Greer*

At some point on August 10, 2016, Tufts called Greer's office again and left a message stating that while Madison was in the bathtub, she had inserted a doll into her vagina to the point of bleeding. By the time Greer was able to return that call, Tufts had already scheduled an appointment for Madison with Torrie. During that call, Tufts elaborated on the message he had left earlier, stating that he had caught Madison inserting a doll into her vagina and rectum and that after he had caught her, she had thrown herself down and started thrashing around in the tub. He told Greer that as a result, Madison had suffered bruises on her body, a fattened lip, and marks on her face. Tufts also volunteered that during the previous night, Madison had called out to him and had hit herself in the eye, causing swelling and marks. Much like Curtis had averred, Greer testified at trial that Tufts left her with the impression that he was more concerned with documenting the injuries than he was for Madison's care. Specifically, Greer said that "he was calling with information that was not given to us because he was concerned about what he -- what -- what someone might think his involvement might be."

Greer advised Tufts to seek immediate medical attention for Madison. But Tufts told Greer that immediate medical attention was not necessary and that he had scheduled an appointment for Madison to be seen at the pediatrician's office the following day. And according to Greer's notes of the conversation, Tufts told her that he was concerned he would be accused of causing the injuries to Madison. Greer's

15

notes also reflect that Tufts reported that Madison had said that when she was in Poland, she had been kept in a cage and that her foster father in Poland would stick his fingers, as well as objects, in her vagina.

**F. August 11, 2016**

*Pediatric Appointment*

Gabby took Madison to her August 11, 2016 appointment with Torrie. And in speaking with a nurse before seeing Torrie, Gabby provided the nurse with additional information regarding Madison. Among the new information Gabby provided was a statement that approximately a week before, Madison had inserted a doll into her vagina and had inserted a Hot Wheels car into her rectum. Gabby said that they had spoken with a counselor about it.

Regarding the August 9, 2016 injury, Gabby stated that Madison had been bleeding off and on and that she was having to place a panty liner in Madison's underwear to manage the bleeding. Gabby additionally stated that Madison had been hurting herself by purposely hitting herself, by throwing herself into her nightstand, and by throwing herself into the fireplace. Gabby said that Madison had a history of repeatedly hitting her head when she was in Poland. And Gabby reported that these behaviors had escalated over the previous month.

When Torrie came into the room, Gabby told her additional information about the circumstances surrounding their visit. Gabby told Torrie that Madison had a history of physical and sexual abuse when she lived in Poland and that she masturbated, a

16

behavior that had increased over the previous month. Regarding the August 9, 2016 incident, Gabby said that when Madison woke up the next morning (August 10), there was blood everywhere, and she also stated that the wound had been continuously oozing.

During the appointment, it did not seem to Torrie that Madison was experiencing any pain or discomfort. Based on the information she had been provided, when Torrie examined Madison, she expected to see only some superficial cuts. But when Torrie looked at the injured area, she was so shocked by its severity that she asked her nursing staff to stand back. Although she did not notice any bleeding, Torrie did see lacerations on Madison's labia and bruises on her perineum. And after concluding that she would not be able to sufficiently treat Madison's injury in her clinic, Torrie told Gabby to take Madison to the Cook Children's emergency room.

*Emergency Room Visit*

Gabby left Torrie's office with Madison, went to pick up Tufts and Taryn, and then took Madison to the Cook Children's emergency room. A triage nurse visited with Madison and obtained a history of the events that had led to Madison's emergency room visit. The nurse recorded that Gabby had stated Madison repetitively masturbated with objects, including a doll and a Hot Wheels car, and that she was seeing a counselor. The nurse further recorded that Gabby said Madison had engaged in that behavior a few times but that after the August 9, 2016 incident, the bleeding would not

17

stop in her vaginal area. The nurse noted that Madison was not experiencing pain and was "smiling, active, and playing."

The nurse also recorded that Madison had bruises on her face. Gabby told the nurse that Madison engaged in self-harming behavior and that Madison told her that she threw herself into her nightstand. But Gabby added that she had never seen Madison hurt herself and that she and Tufts did not know about the bruises until the morning. Gabby additionally said that Madison had a large bruise on her back and buttocks, which she said had resulted from Madison's falling down the stairs. The triage nurse recorded Madison's chief complaint as sexual abuse.

After Madison had been triaged, Dr. Doreen Teoh, an emergency medicine physician at Cook Children's Hospital, went in to see her. Tufts and Gabby provided Teoh with additional information concerning Madison's bruises. They said that Madison would cause bruises to herself and then exacerbate their severity by pressing down hard on them. The couple indicated that Madison was seeing a counselor, and the counselor had stated that these behaviors were attention-seeking in nature.[3] And they explained Madison's adoption and stated that she had been physically and sexually abused when she was in foster care in Poland. Tufts and Gabby added that Madison's birth mother had consumed alcohol throughout her pregnancy with Madison.

---

[3]There is no evidence in the record that Madison ever saw a counselor while in Tufts and Gabby's care.

18

Teoh examined Madison. She noticed that there was mucus and dried blood throughout Madison's genital area, and the wound was actively bleeding. Madison also had a laceration that extended from her vagina, through her perineum, and into her rectum. During trial, Teoh explained the injury in layman's terms as follows:

> So you have a -- your urethra, where you urinate out of, in the front. Then you have the vagina. And then the rectum is below that. You know, going from front to back. And so there -- you know, these are all distinct holes. There is, you know, no connection between these holes. But when I examined [Madison], you know, there was . . . this laceration or a created connection between the vagina and the rectum.

She also elaborated on the severity of this injury by comparing it to tears that occur during childbirth. Teoh stated that on a scale of severity, a tear that went from the vagina to the rectum, called a fourth-degree tear, was the most severe that could occur and that even childbirth rarely resulted in that kind of tear. Teoh told the jury that in her eighteen years of practice, she had never seen a tear with the degree of severity of Madison's except in medical textbooks. When asked by the prosecutor whether the delay in Madison's receiving treatment could have caused a "life-threatening infection," Teoh said, "It's possible."

Suspicious that Madison's injury could not have occurred the way Tufts and Gabby had explained, Teoh alerted Cook Children's Child Advocacy and Resource Evaluation (CARE) Team, which specializes in treating abused children. She also notified a social worker and instructed them to contact CPS. And due to the severity of Madison's injury, Teoh referred her for immediate surgery.

Dr. Jose Iglesias, a pediatric surgeon at Cook Children's Hospital, was the surgeon who operated on Madison. Before operating on Madison, Iglesias received a brief overview of Madison's injury from Tufts and Gabby, who told him that Madison had used a doll while masturbating and had caused some bleeding. When he was able to examine Madison more comprehensively in the operating room, Iglesias realized that Madison had sustained the fourth-degree tear, an injury that he testified was "very rare." In fact, it was one of the worst injuries he had ever seen in his eighteen years as a pediatric surgeon.

Iglesias surgically repaired the injury. To ensure that Madison did not develop fistulas, that the surgical repair did not break down, and that the wound did not become infected, he had to perform a colostomy, which he explained was a procedure where he brought out a loop of Madison's intestines so that she would defecate into a bag. Iglesias explained the difficulty of the procedure he performed on Madison's injury:

> So this is basically a complex repair, which means putting together a lot of different tissues. It was a repair of the vagina, so putting back together the -- the female external genitalia, putting together the soft tissues and the muscles kind of between the rectum and vagina, and then putting back together the front part of the sphincter that was torn around the anus. Sphincters are -- are round muscles that open and close, hopefully in a timely fashion. So that's -- that sphincter had basically been torn to a C, so I had to kind of reclose that to -- to make it a complete circle again so that it would be functional.

Iglesias concluded that the injury could not have occurred the way Tufts and Gabby had said because a five-year-old child self-stimulating with a doll was inconsistent with the level of force that would have been necessary to cause the injury

Madison had sustained. Regarding the amount of force, Iglesias said, "It's hard to quantify that, but it would have taken a lot, a significant amount of force or a very large object, you know, with some -- with -- with a -- with a good amount of force, too." Iglesias said that the initial injury "would have been incredibly painful and [that] it would have been very uncomfortable even after the acute episode of the irritation of a raw, you know, several-centimeter injury getting an irritant, urine, and stool, on it a few times a day." He said that the injury "would have bled a lot" and that he would "[a]bsolutely" consider the injury Madison sustained as a serious bodily injury.

Iglesias told the jury that had Madison been brought for medical treatment immediately, he "would have probably been able just to [close the wound] and avoid the colostomy." He also said that the two-day delay in failing to seek medical care "confirmed the fact that [he] had to do" the colostomy.

## G. August 13, 2016

On August 13, 2016, Christi Thornhill, a sexual assault nurse examiner who was a member of the Cook Children's CARE Team, was called in to review Madison's case. Thornhill reviewed the records related to Madison's case, including photographs of her injuries. Based on that review, Thornhill noted that in addition to the severe injury to Madison's genitalia, Madison had sustained bruises all over her body that were in various stages of healing.

Thornhill spoke to Gabby about Madison's injuries. Gabby related that on the night of the injury, Tufts had called her and said that Madison had put a doll inside of

21

her. She also said that Tufts told her that Madison had thrown herself down and flopped around in the bathtub. According to Thornhill, Gabby said that after she returned home from work on August 9, she woke Madison to check on her. Gabby said that Madison complained of pain and that there was blood oozing from her genitalia. Gabby told Thornhill that when Madison continued to have oozing and discomfort the next day, she and Tufts had called her pediatrician's office but were not able to get her in to be seen until the following day.

Gabby also told Thornhill that Madison had a history of self-harming behavior, as well as a history of excessive masturbation with objects. But Gabby added that she had never personally seen Madison engage in these behaviors; rather, she only saw the results of those behaviors, such as the bruises. Gabby said that although she never saw those behaviors first-hand, she learned they were occurring from Madison herself. Gabby further reported, however, that a couple of weeks prior, Madison had been standing on some stairs and had thrown herself backwards onto the ground. Gabby said that she had seen Madison do that twice.

Thornhill, however, was skeptical that Madison's injuries could have occurred in the way Gabby had related. For one thing, Gabby had told Thornhill that Madison's self-harming behaviors and excessive masturbation had been longstanding problems, but she also told Thornhill that Madison had not been seen by a counselor for these behaviors, and Gabby did mention that neither she nor Tufts had ever raised them with Madison's pediatrician. For another thing, Thornhill concluded that Madison could not

22

have caused the injury to her genitals by using a doll to masturbate because her five-year-old, forty-pound frame could not have mustered the level of force that was necessary to cause the injury.

Thornhill then spoke to and examined Madison. When Thornhill asked Madison how the injury to her genitals had occurred, Madison replied that "[t]he monster did it" and that the monster lived in Poland. In addition, Madison did not mention to Thornhill that she had fallen in the shower. Thornhill grew concerned that the injury to Madison's genitals had not been self-inflicted but instead had been caused by another person who had recently had access to her. She also testified about the damage the delay in treatment could have caused:

> The fact that they waited as long as they did to seek medical care certainly put her at risk for developing infection, because, again, this child was stooling and urinating with those open wounds, and stool and urine both carry bacteria that could have led to very severe infection, including sepsis, which can cause death.

Thornhill also said that sepsis is a bloodstream infection that can "cause organs to fail and can lead to death" and that is an "overwhelming . . . infection that attacks the entire body [and] if it develops, patients can die as a result of that."

Thornhill also spoke to Tufts. He told Thornhill that on the evening of August 9, he had put soap on a loofah for Madison and then left her to shower on her own while he went to check on Taryn. And he told Thornhill that he heard Madison "whimpering" and that when he went into the bathroom to check on her, he found her with the doll in her hands, and the doll had blood on its feet and head. Tufts said that

23

when he asked Madison what had happened, she said that she had put the doll inside her. Tufts reported to Thornhill that Madison then proceeded to "flop in the tub like a fish out of water."

Tufts also offered an explanation for Madison's bruises. He told Thornhill that Madison had been engaging in self-harming behaviors and that she had a history of sleepwalking and crashing into things. He also told her that Madison frequently masturbated. Tufts explained that Madison's behaviors had begun escalating around the first week of August 2016 and that she had been throwing fits and throwing herself on the ground. But Thornhill determined that the explanations she had been given for Madison's injuries were inconsistent with the injuries she had examined, and she ultimately concluded that those injuries had resulted from abuse.

Dr. Jayme Coffman of the CARE team testified at trial that she had examined Madison's case and that the delay in treatment could have caused Madison's serious health issues. When asked specifically what the risks of delaying treatment were, Coffman said, "There's increased risk of infection because you've torn into intestine, right into the rectum, where bowel movement and all manner of nasty bacteria are. So, yeah, it increases that risk."

Coffman also discussed the degree of pain that Madison would have felt when the initial injury occurred. By Coffman's account, the wound would have initially been extremely painful, and Madison would have more than whimpered; rather, she would have screamed loudly when it occurred. Coffman also said that it would have been

24

impossible for Madison to have caused the injury to herself: "There's no way on God's green earth she could do it to herself. It would take too much force." And Coffman testified that the injury would have been bleeding profusely and that blood would have been "running down [Madison's] legs" the entire time Tufts would have been with her in the bathroom.

Coffman also found Tufts's claims that Madison had been injured with a doll dubious. For example, Coffman said that the object that caused the wound would have been larger than a doll. And from Coffman's perspective, the picture of the doll with blood on its legs was inconsistent with Madison having been injured by it; rather, Coffman opined that she believed, given the demarcation of blood on the doll's legs but not anywhere else, that the doll appeared to have been dipped in something.

## H. August 15, 2016

On August 15, 2016, while Madison was still recovering in the hospital, Phillip Breedlove, a licensed professional counselor at Cook Children's Medical Center, went to see her in her hospital room. Breedlove visited with Madison alone. During the visit, Breedlove asked Madison why she was in the hospital, and Madison replied that she did not know. Breedlove then told Madison, "I see that you have a bruise on your face." Madison replied with something that was unintelligible, but Breedlove did understand her to say the word "bathtub." So he followed up by asking Madison, "You got hurt in a bathtub?" Madison replied, "No, my daddy was a bad boy. He told me

not to . . . and pulled me down too hard."[4] Madison also told Breedlove, "I don't like Daddy, but I love him. He was a bad boy that time."

## I. Madison's Outcries after Discharge from the Hospital

The concerns surrounding Madison's injuries resulted in investigations from both CPS and the Denton Police Department. As part of the investigation, Madison underwent a forensic interview while still at the hospital. Following the forensic interview, CPS performed an emergency removal and placed Madison with Xenia.

While the case was under investigation, Xenia reported information she had received from Madison when she was driving Madison home from a follow-up doctor's appointment. During the drive, Madison told Xenia, "I didn't hit my sister. Daddy was mad at me, and he hurt my booty and my vagina." After a pause, Madison then said, "It was an accident. He said . . . he was sorry, and I hugged him." Xenia also reported that while she was shopping with Madison a few days later, Madison said, "Daddy stuck Elsa in my booty, and Daddy is a mean man."

Additionally, on August 26, 2016, Madison began seeing Rebeca Mata, a licensed professional counselor. Throughout her counseling with Mata, Madison made several statements referencing Tufts and the August 9, 2016 incident. During a September 5, 2016 counseling session, Madison told Mata that her daddy had hurt her. When Mata

---

[4]Although Madison said something between the word "to" and the word "and," Breedlove could not understand what it was.

26

asked Madison how her daddy had hurt her, Madison replied that he had hurt her "booty." And when Mata asked Madison how he had hurt her booty, Madison responded, "[W]ith Elsa." Later, on September 12, 2016, Madison told Mata that "[d]addy is a bad guy."

During a September 21, 2016 counseling session, Madison said, "Daddy is mean. He put Elsa in my booty, and I cried." Madison told Mata on September 30, 2016, that her daddy was mean, and when Mata asked her who her daddy was, Madison said Tufts's first and last name. On November 14, 2016, Madison told Mata that she missed her mommy but not her daddy and that she did not like him. At a December 2, 2016 session, Madison said that she had a bad secret and that it was when her daddy had hurt her. After making this statement, Madison pointed to her vagina and said that she felt sad when it happened and that she cried. Madison told Mata at a December 29, 2016 session that she did not like her daddy and that she missed her mommy. And on May 12, 2017, Madison said that she would not go live in the old house if her daddy still lived there because she did not want to see him because he was bad.

In July 2017, Madison was placed back with Amy and Glenn, who ultimately adopted her. On one occasion after Madison had finished taking a bath, she told Amy that Tufts had hurt her "bum" in the shower and that her bum was bleeding everywhere. Madison also told Amy that Tufts had hurt her with a doll in her "bum." About a year after Madison's return to Amy and Glenn's home, Madison was in the bathroom after

27

having taken a bath, and Glenn was helping her dry her hair. Madison pointed to the shower and said, "Papa, this is where [Tufts] -- this is where this happened."

## J. Madison's Testimony

Madison testified at trial. She was eight years old at the time. Prior to her testimony, the trial court inquired of Madison whether she knew the difference between the truth and a lie. Madison replied, "No." But Madison did acknowledge that she knew how to tell the truth, and she said multiple times that when she answered the attorneys' questions, she would tell the truth. The trial judge then asked, "If I told you that I was a big purple elephant right now, would that be a truth or would that be a lie?" Madison said, "Lie."

Outside the jury's presence, the prosecutor, who was wearing a black suit, asked Madison whether her suit was blue, to which Madison said, "No." The prosecutor also asked Madison that if she said she was wearing a blue suit, whether that would be "a lie or a truth?" Madison responded that it would be, "A lie." Madison also assured the prosecutor that she would truthfully answer any question the attorneys posed of her. Defense counsel asked Madison, "[W]hat's the difference between the truth and a lie?" Madison said, "No." Defense counsel also asked her, "What does it mean to tell the truth?" or "[W]hat does it mean to lie?" Madison answered, "I don't know" to both questions.

The trial court allowed Madison to testify, and she recalled how she had previously lived in Texas with Xenia after Xenia had picked her up from the hospital.

28

Madison said that she had been in the hospital because she had been hurt. Specifically, Madison said that Tufts had hurt her "bum" with a doll when she was "out of the shower." Madison said that she remembered bleeding and then being taken to the hospital. On cross-examination, Madison was unable to recall Gabby's name, but she did know Tufts's and Taryn's names and she knew that the family unit "was just the four of [them]." Madison also could not remember the size of the house she lived in while in Tufts and Gabby's care, nor could she remember how many toys she may have had.

Madison said that both Gabby and Taryn were home at the time of the doll incident, but that they were not in the bathroom—it was just her and Tufts. She could not remember whether she called Tufts by his first name or by "Daddy." Madison also thought that the home she lived in with Tufts "probably" only had one bathroom. Madison could not recall many details of the house, and she could not recall getting ready for bed the night of the doll incident. She did remember the drive to the hospital, but she believed it was just her and Tufts in the car. She did not remember having surgery, but she did remember Tufts watching cartoons with her while she was in the hospital.

Madison said that Tufts had never asked her to touch his private area, but when asked whether Tufts had touched her private area, Madison said, "I don't know." She also denied having ever placed a Hot Wheels car in her anus.

29

## K. Detective Bearden's Investigation

Detective David Bearden with the City of Denton Police Department testified at trial that he first interviewed Gabby and that Gabby explained to him how Madison came into the couple's care, how the couple came to adopt Madison, and how Madison had experienced issues in Poland prior to coming to the United States. Bearden said that when he asked Gabby to see the text messages between Tufts and herself, Gabby said that they were no longer on her phone because she had "done a factory reset on her cell phone." Bearden found this suspicious. He was, however, able to gather pictures from Gabby's phone, including the picture of the doll with bloody legs that Tufts had sent Gabby. Gabby told Bearden that when she first spoke with Tufts about the doll incident, Madison was screaming in the background. Bearden learned from Gabby that the couple did not take Madison to the hospital for "[t]wo days" and that he found this concerning given the severity of the injury.

Gabby was able to explain some, but not all, of Madison's bruises to Bearden. And Gabby told Bearden that she had not seen Madison self-harm or masturbate. Bearden also learned that Taryn was never disciplined but that Tufts frequently disciplined Madison, at first by spanking, but then later by placing her in time-out, making her stand in a corner, or taking away her favorite electronics.

Bearden was able to look at the journal that Amy gave the couple at the airport, and he described how it mentioned that Madison had some behavioral issues, but it did not state anywhere that Madison had engaged in self-harming, excessive masturbation,

or masturbation with any type of objects. Bearden said he had never seen an injury to a child as bad as the one Madison sustained.

Bearden interviewed Tufts at the police station. According to Bearden, Tufts's explanation for Madison's alleged behaviors was because she had been abused in Poland. Bearden said that Tufts's descriptions for how Madison had bruising and the injury from the doll did not correspond with the injuries found on her body. Tufts told Bearden that when the doll incident occurred, he had returned to the bathroom to check on Madison, that she was standing and the doll was inside her, that he asked her what she was doing, "and [that] she dropped it." When confronted with the fact that he had told his mother that he had removed the doll from Madison, Tufts told Bearden he did not remember saying that to her.

Bearden searched Tufts and Gabby's home multiple times. Bearden found it suspicious that Tufts had washed the sheets that Madison had slept on the night of the doll injury. He also found it suspicious that Tufts had already thrown away the doll and Madison's panties. Bearden did not find any Hot Wheels toys when he searched Tufts's house.

It also troubled Bearden that when he examined Tufts's phone after searching the home, Tufts's phone logs did not go back more than a few days. According to Bearden, phone logs typically "go back as far as months," and the condition of Tufts's phone logs was reminiscent of Gabby's phone reset. And despite Tufts's having said the incident happened in Madison's bathroom and that he had cleaned blood off the

31

sink, Bearden was surprised to learn that there was no blood found in the bathroom or shower even though the bathroom had clearly not been cleaned.

Bearden said that through his investigation he was unable to corroborate that Madison had ever masturbated or self-harmed at school. Xenia reported to Bearden that she never saw Madison masturbate or self-harm and that Madison had made multiple statements that Tufts had hurt her. Madison had also made an outcry to a therapist after the doll incident.

Bearden was also unable to corroborate that Madison had been the victim of physical or sexual abuse in Poland prior to coming to the United States. And Bearden said that Tufts had left him with the impression that Amy and Glenn relinquished Madison because of excessive masturbation and self-harm, but Amy and Glenn denied ever having said that was the reason.

According to Bearden, text messages[5] between Gabby and Tufts made in the weeks and days leading up to the doll injury revealed that the couple was having marital problems and that Gabby was considering leaving Tufts. In these messages, Gabby threatened to leave multiple times, and she called him a liar and said that she had

_____

[5]It is not clear from the record how Bearden was able to obtain the text messages given that Gabby had reset her phone and Tufts's phone logs were incomplete, but Bearden testified that he obtained the messages during a second search of the home from "iPads or the phones."

32

considered breaking off their engagement prior to marriage because of his lying. The texts also included a photo of the doll with blood on its legs.

Bearden agreed that during the forensic interview, Madison did not make an outcry or implicate Tufts regarding the doll injury. Madison did say in the interview that she had inserted her fingers and her foot in her vagina, but Bearden thought these claims dubious. Bearden said he learned that the couple had been putting surgical tape on Madison's hands at night in an effort to stop her from masturbating. After ultimately concluding that Tufts had caused Madison's injuries, Bearden applied for and obtained an arrest warrant for Tufts.

## L. Tufts's Testimony

At trial, Tufts testified that he has never hurt anyone in his entire life and that he was being falsely accused of having harmed Madison. By Tufts's account, he did not hurt Madison on August 9, 2016, he would never do anything to hurt Madison, he loved her, and he treated her like she was his own daughter.

Tufts said that when he and Gabby learned of the possibility of adopting Madison in June 2015, they believed it would be several months before they could adopt her, and they were surprised that they were picking her up within weeks of learning of her availability. Tufts recalled that the couple was initially told that Madison "had no issues" and that she was a "normal, healthy" girl.

Tufts said that at first he had no concerns about Madison's behavior but that he was concerned that Madison did not arrive with basic things like a toothbrush or extra

33

socks. He averred that Madison seemed small for her age. The same day as her arrival, Tufts read the notebook that Amy had provided. Tufts said it was then that he began to grow concerned because Amy had described in the notebook how Madison would have hour-long fits and would masturbate.

According to Tufts, for the first several months after Madison arrived, she would "have fits" by either stomping her feet or screaming and yelling for an hour or longer. Madison would throw herself on the ground, urinate on herself, kick the family's pets, or hit walls. Tufts said that in February 2016, he called a certified counselor and reached out to Diana about Madison's behavior. Tufts stated that Madison's behavior escalated over the few months leading up to the doll incident. Specifically, she had become more aggressive toward Taryn, sometimes hitting her. By July 2016, he had to put a gate at the top of the home's stairway to prevent Madison from throwing herself down the stairs.

Regarding Madison's habit of masturbating, Tufts said that he and Diana had once witnessed Madison masturbate in the den while they were all watching television. Initially, according to Tufts, Madison would stimulate herself on the outside of her clothing but progressed into putting her fingers inside of her pants. Tufts said that prior to August 9, 2016, he had never seen Madison masturbate using any type of object, but that Gabby had seen Madison do so and that Madison had told Gabby that she had done so. He averred that he and Gabby had attempted to quell Madison's increasing

34

masturbation by either making her wear mittens at night or by taping her fingers together with surgical tape. Neither approach worked.

Tufts said that Madison often self-harmed and that it had escalated over time. He also said that Madison frequently experienced bruising from her behavior on her arms, head, and face and that, especially if someone was watching, she would forcefully press down on the bruises, making them worse. Tufts referred to this behavior as "attention-gett[ing]." By July 2016, Tufts said that Madison's behavior had progressed to the point that she would fall back onto the ground and start kicking and screaming loudly while hitting her arms and legs "up and down on the floor." He also insisted that Gabby had witnessed Madison self-harm. Further, Tufts said that when he was at work, and Gabby was watching the two girls, he would receive texts from Gabby "telling" him that he needed to come and get "[his] child."

By Tufts's account, Gabby was frustrated with Madison as she prepared to go to work on August 9, 2016, but that otherwise, when he got home from work and Gabby had left for her job, the evening was fairly routine. Later that evening, Tufts had Madison and Taryn go to separate bathrooms to shower. After getting Madison started, he said he went to check on Taryn. As he assisted Taryn, Tufts said that he grew concerned that he had not heard Madison turn on the television, which seemed odd to Tufts because Madison was capable of getting out of the shower herself, and normally by that time she would already have dressed herself and turned on the television. As he approached the bathroom where Madison was located, Tufts heard "a whimpering

35

sound or something." Tufts described for the jury what he saw when he walked into the bathroom:

> I saw the shower curtain was halfway open, which it never was. I saw [Madison] with her left leg on the ground, her right leg on the -- like on the tub, and I just saw the doll. I don't know if it was head or feet first. I saw a doll between her legs, and I was like, [Madison], what -- I mean, I said, [Madison], what the hell are you doing? Because I was freaked out. I was like, oh, my God. I didn't know what was going on.

As far as the specific location of the doll, Tufts said that he did not know exactly where it was other than it was "in between her legs," and Madison was holding the doll with her right hand. Tufts said that Madison's response to him questioning her about what she was doing was to drop the doll onto the floor outside the bathtub. Tufts said that he grabbed the doll to prevent Madison from getting it again, he placed it on the counter near the sink, but he did not notice that it had blood on it at the time.

Tufts stated that Madison responded by throwing "a fit because she lost her toy" and then, the "next thing [he] knew" Madison turned around backward, with her head "falling toward the faucet and the drain plug . . . in the bathtub." From there, Madison began to "zone out," so Tufts grabbed her by her shoulders in an effort to stop her movement. After having her sit down in the tub, Tufts said that is when he first saw "blood droplets." By Tufts's account, he then put a towel on Madison and told her to put her "hand [t]here and keep pressure on it and don't move." Tufts alleged that Madison told him that she apologized for having hurt herself and that she then began

36

to cry. Tufts said that when she "calmed down again, she wasn't bleeding anymore" that he could see.

According to Tufts, he then ran to check on Taryn, dried her off quickly, put her pajamas on her, laid her on the master bed, and turned on the television, but when he returned to Madison, she "had been messing with it," and he again saw that there "wasn't that much" blood. He then called Gabby, but she did not answer, so he called Diana. Diana asked Tufts to send her a picture of the doll, so he went to the bathroom to photograph it. Tufts said that it was at that time that he noticed blood on the doll. Tufts took a picture of the doll's legs and texted it to Diana, who then called Tufts, told him to call Gabby and to have Gabby come home and take Madison to the doctor. He then texted Gabby the picture of the doll, and Gabby called him.

Shortly after, Tufts called Diana and told her that he did not think Madison was bleeding anymore and that Gabby was coming home to check on her. Tufts said that while on the phone with Gabby, he expressed that Madison did not appear to be hurt. Tufts described to the jury that by that time, Madison was acting normal, brushing her teeth, and combing her hair. After that, she began watching television and was "jumping and bouncing around." At no time did she appear to Tufts to be in pain. Tufts said that he then waited for Gabby to come home, expecting that she would check on Madison. Tufts testified that he considered taking Madison to the emergency room, but Gabby checked on Madison and told Tufts that she was fine and sleeping.

37

The next day, Tufts went to work as Gabby watched the girls. Tufts said that while he was at work, Diana called him and inquired whether Madison needed to go the hospital, and he told her that Madison was fine. Tufts also communicated with Gabby and learned that she had seen "a little bit of blood in" Madison's panties, so she put a panty liner in her panties and told Madison that if she bled any more, they would take her to the doctor. Gabby also told Tufts that Madison "wasn't feeling too good."

Tufts said that when he left work that afternoon, he contacted Cook Children's Pediatrics. According to Tufts, Madison's doctor was on maternity leave, so the office told him they would call him back to schedule an appointment with another doctor. Because he had not received a return call by 4:30 p.m., Tufts said he called the pediatricians' office again. He was able to schedule an appointment for Madison at 1:30 p.m. on August 11, 2016. Once Tufts got home on the evening of August 10, he said he observed Madison and that other than her not moving around as much as she normally would, she said she was okay and did not appear to be in any pain, and he did not witness any bleeding.

After Gabby took Madison to the scheduled appointment, she called Tufts and told him that she would need to take Madison to Cook Children's emergency room to "get stiches," but that she was going to pick him and Taryn up on the way. Tufts said that he ended up speaking with several nurses, doctors, and hospital personnel that day. Tufts averred that he provided these people with the same information he testified about and that at least one of these conversations occurred in Madison's presence.

38

According to Tufts, the day after surgery, August 12, he spent time in the hospital with the other three family members, and Madison was acting fine, asking Tufts to hand her things like crayons and asking that he give her a hug and a kiss. On August 13, Tufts went to the hospital to learn how to change Madison's colostomy bag. Tufts said that in front of a nurse, Madison said that he was her "daddy."

Later that day, Tufts spoke with Thornhill alone. Tufts said that he provided Thornhill with the same information he had other nurses and doctors, which is the information he said he had testified about. On August 15, Tufts went to the hospital earlier than normal because CPS and the police had been questioning Gabby. Tufts then spoke with Bearden at the hospital and set up a time to be interviewed at the police station. Shortly after speaking with Bearden at the hospital, Bearden and others informed Tufts and Gabby that they would need to leave and that CPS would be taking custody of Madison. After Gabby and Tufts left the hospital, Tufts called Diana, who was watching Taryn. Diana told Tufts that she had been asked to come and speak with CPS and to bring Taryn with her. After speaking with CPS and being informed that Taryn was also being removed from Tufts and Gabby's care, Diana called Tufts to inform them that Taryn would be placed with Diana.

Tufts said that he went to be interviewed by Bearden at the police station on August 16. According to Tufts, he went voluntarily and did not have an attorney accompany him because he believed he had done nothing wrong and had nothing to hide. Tufts said that he was completely honest with Bearden and that at the end of the

interview, he consented to Bearden's searching his home. Bearden and another officer searched the home, and then later via a search warrant, searched the home again.

Tufts said that the reason he and Gabby had never sought counseling for Madison prior to July 2016 was because they had been led to believe that Madison's behavior of hour-long screaming and frequent masturbation was "typical European foster children behavior." He also averred that Curtis was mistaken that the first time he spoke with her was August 9 and that Greer was lying about not having sought phone updates about Madison from Tufts. And he acknowledged that after his appointment on July 28 with Greer, he had not attempted to call a counselor for Madison until calling Curtis two days prior to the doll incident, even though Curtis had testified that he had not contacted her until the day of the incident.

Tufts also testified that he learned from Gabby that Madison had stated that she had been harmed in Poland and that she had slept in a crate there. According to Tufts, Madison "was always referring to the monster in Poland."

## M. Indictment, Conviction, and Sentencing

A grand jury indicted Tufts on three counts of injury to a child, all committed "on or about the 9th day of August, 2016." *See* Tex. Penal Code Ann. § 22.04(a). Count I alleged that Tufts had intentionally or knowingly caused serious bodily injury to Madison "by penetrating the sexual organ and/or anus of [Madison] with a doll or an unknown object." Count II alleged that Tufts had intentionally or knowingly caused bodily injury to Madison "by grabbing [Madison] with [his] hand, by squeezing

40

[Madison] with [his] hand, by striking [Madison] with an unknown object[,] or by causing [Madison] to strike an unknown object." And Count III alleged that Tufts had intentionally or knowingly by omission, caused serious bodily injury to Madison "by failing to seek medical attention in a timely manner, and [Tufts] had a legal duty to act, namely, as a parent or legal guardian."

A jury found Tufts guilty on all three counts. Following the punishment phase, the jury assessed Tufts's punishment at twenty years' confinement on Count I, five years' confinement on Count II, and twenty-eight years' confinement on Count III. The trial court sentenced Tufts accordingly. It further ordered that the sentences imposed for Count I and Count III run consecutively and that the sentence imposed for Count II run concurrently with the sentence imposed for Count I. This appeal followed.

## III. DISCUSSION

### A. Sufficiency of the Evidence

In his first two issues, Tufts argues that there is insufficient evidence to support his convictions on Count III and Count II, respectively. We disagree.

#### 1. Standard of Review

When reviewing whether sufficient evidence supports a conviction, we look at all of the evidence in the light most favorable to the jury's verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979);

41

*Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The

essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

43

## 2. Applicable law

A person commits the offense of injury to a child if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child" serious bodily injury or bodily injury. *See* Tex. Penal Code Ann. § 22.04(a)(1), (3). For purposes of an injury-to-a-child by omission offense, an omission that causes a child to suffer serious bodily injury is conduct constituting an offense if the actor has a legal or statutory duty to act. *Id.* § 22.04(b)(1); *see Estrella v. State*, 546 S.W.3d 789, 795 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd); *Williams v. State*, 294 S.W.3d 674, 684 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (op. on reh'g).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). It is therefore not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; rather, it must prove that the defendant caused the result with the requisite criminal intent. *Estrella*, 546 S.W.3d at 795.

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Pen. Code Ann. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The particular results at issue here are "serious bodily injury" (Count III) and "bodily injury" (Count II).

44

"Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "Bodily injury" means "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8).

### 3. Count III: Injury to a Child by Omission

In his first issue, Tufts challenges the sufficiency of the evidence to support his conviction for Count III, the count alleging that he committed injury to a child by omission. *See id.* § 22.04(a)(1). The omission alleged in the indictment was Tufts's failure to seek medical attention for Madison in a timely manner. Tufts's challenge falls into two categories: (1) that no injuries occurred to Madison beyond what would have occurred with proper treatment to the injuries she sustained from the doll, and (2) that the State failed to prove that Tufts had the requisite knowledge to prove violation of his parental duty of care or that his omission was intentional or knowing.

#### a. Injury Beyond the Initial Doll Incident

Tufts acknowledges that the jury found him guilty on Count I and thus must have believed that he caused Madison serious bodily injury by inserting a doll or an unknown object into her sexual organ and/or anus. But he argues there is no evidence that any subsequent delay in obtaining medical treatment for that injury itself caused Madison to sustain a serious bodily injury. He does not dispute that as Madison's father, he had a duty to obtain timely medical care for that injury. And he concedes that there is evidence that the delay between when Madison sustained that injury and when she

45

received medical care for it increased Madison's risk of developing certain health complications. Pointing to our sister court's decision in *Estrella*, Tufts contends that it was not sufficient for the State to prove merely that the delay put Madison at risk of sustaining additional serious bodily injury; instead, he maintains the State had to prove that the delay actually caused Madison to sustain such an injury. 546 S.W.3d at 798–802. Tufts argues the State presented no such evidence.

But viewing the evidence in a light most favorable to the jury's verdict, the record demonstrates that the rule Tufts points to from *Estrella* is satisfied and that the delay in seeking treatment in this case (1) created a substantial risk of death to Madison and (2) caused a protracted loss or impairment of the function of a bodily member or organ. *See id.*; Tex. Penal Code Ann. § 1.07(a)(46). Either is sufficient to support the jury's finding that the delay caused a serious bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(46).

As to a substantial risk of death, multiple witnesses testified that the delay in seeking treatment could have caused Madison to catch a deadly infection. Specifically, when asked "[w]hat loss or impairment could have resulted" from the delay in treatment, Thornhill averred that the "fact that [Tufts and Gabby] waited as long as they did to seek medical care certainly put [Madison] at risk for developing [a] very severe infection, including sepsis, which can cause death." Indeed, Thornhill testified three times that Madison could have developed sepsis and died due to the delay in her receiving treatment. Similarly, when asked by the prosecutor whether the delay in

46

Madison receiving treatment could have caused a "life-threatening infection," Teoh testified, "It's possible." And when Coffman was asked specifically what the risks of delaying treatment were, she said, "There's increased risk of infection because you've torn into intestine, right into the rectum, where bowel movement and all manner of nasty bacteria are. So, yeah, it increases that risk."

Citing *Ex parte Henderson*, Tufts argues that this testimony is insufficient to prove a substantial injury because the testimony only described "a risk" that Madison could or may develop a life-threatening infection. *See* 384 S.W.3d 833, 833–34 (Tex. Crim. App. 2012) (referring to need to be able to determine cause of child's injury "with a reasonable degree of medical certainty"). But the use of hypothetical scenarios or questions to establish that injuries could cause a substantial risk of death to a person has been held sufficient to support a conviction. *See Boney v. State*, 572 S.W.2d 529, 532 (Tex. Crim. App. 1978) (holding that evidence that victim sustained laceration, which doctor testified could cause shock that could result in death and could cause substantial risk of death, was sufficient to support finding of serious bodily injury within language of aggravated-assault statute); *Johnson v. State*, No. 07-02-0440-CR, 2003 WL 22332274, at *1 (Tex. App.—Amarillo Oct. 13, 2003, no pet.) (not designated for publication) ("That the doctor said, at times, the injuries 'could' have been life threatening is of no consequence. Use of the word 'could' does not render his testimony hypothetical or speculative."). We hold that a rational factfinder could have found beyond a reasonable

doubt that Tufts's delay in seeking medical care for Madison placed her at a substantial risk of death. *See Queeman*, 520 S.W.3d at 622.

As to a protracted loss or impairment of the function of one of Madison's bodily members or organs, after Iglesias had explained that he had to perform the colostomy because Madison's injury was not "a new injury," the prosecution asked Iglesias specifically what he meant, and he said, "If this was a brand-new and fresh injury, depending on what it looked like, then odds are we would have probably been able just to -- to close it and avoid the colostomy." Iglesias also told the jury that the delay "confirmed the fact that [he] had to" perform the colostomy. Tufts again argues that this testimony is too speculative to support the jury's finding, but as mentioned above, the use of hypothetical scenarios or questions to establish that injuries could cause a substantial risk of death to a person is sufficient to support a conviction. *Boney*, 572 S.W.2d at 532. We hold that a rational factfinder could have found beyond a reasonable doubt that Tufts's delay in seeking medical care for Madison caused her to suffer protracted loss or impairment of the function of her bodily members or organs. *See Queeman*, 520 S.W.3d at 622.

### b. Requisite Knowledge

Tufts argues that the State failed to prove that he "intentionally or knowingly" caused serious injury to Madison by any delay in seeking medical treatment. The gist of Tufts's argument is that there is no direct evidence that he caused the injury to Madison that required her need for medical care, that he was unaware of the severity of

48

her injury, and that Madison could not recall any details directly implicating him in the injury; thus, he could not have intentionally or knowingly delayed in seeking her treatment. Although at times Tufts's briefing seems to focus on the mens rea element of Count I (the doll injury), given that he is appealing his conviction for Count III in this issue, we will analyze the culpable mental state for Count III (the injury from the delay in seeking treatment).

Contrary to Tufts's position on this issue, mental state is rarely proved through direct evidence and almost always depends on circumstantial evidence. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Smith v. State*, 56 S.W.3d 739, 744–45 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). And in this case, viewing the evidence in a light most favorable to the jury's verdict, the record demonstrates that Madison was severely injured and in need of medical care. Multiple medical professionals testified that Madison's injuries would have resulted in a large amount of blood. The record shows that numerous people, including Greer, Diana, and Torrie, all expressed concern that Madison was bleeding, and all instructed Tufts to take Madison for immediate medical care. And Madison made the specific outcry that Tufts had hurt her with the doll and that there was a lot of blood. A reasonable inference from this evidence is that Tufts was aware that Madison had bled a lot, thus indicating she had a severe injury requiring medical attention. *See Payton v. State*, 106 S.W.3d 326, 329 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[T]he jury could reasonably infer that T.P. was bleeding that morning, and appellant would have noticed it.").

49

Tufts argues that he was unaware that Madison was as injured as she was and that her bleeding had stopped and that is why he did not take her for medical care right away. He also testified that he never saw much blood. But a jury was free to disbelieve his testimony that he never saw much blood (especially given that the jury saw photographs of the bloody doll). And the jury was free to believe the testimony of the witnesses who said that they told Tufts to take Madison for medical care and that the type of injury Madison had sustained would have produced a lot of blood. *See* Tex. Code Crim. Proc. Ann. art. 38.04 ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony . . . ."). In fact, Coffman said that Madison would have been bleeding so profusely that blood would have been "running down [her] legs," and Madison would have been bleeding the entire time Tufts was with her in the bathroom. Iglesias also testified that the injury would have produced a lot of blood, and Gabby told Torrie that the day after the injury occurred (August 10), Madison was bleeding and oozing a lot.

Moreover, it is a reasonable inference from testimony describing Tufts's frantic tenor during phone calls in the immediate aftermath of the injury that Tufts recognized the severity of the injury. Indeed, Gabby, Curtis, and Diana all testified that Tufts sounded panicked when he first called to report to them that Madison was injured. Tufts himself testified that he was very concerned for Madison and that is why he called Gabby and Diana, albeit four hours apart.

Additionally, only Tufts or Madison could have caused the injury while she was in the bathroom when she was injured, and numerous medical witnesses testified that Madison, given her young age and slight frame, could not have inflicted the injury. Thus, this evidence also supports the jury's verdict. *See Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("The record also indicates that Bearnth was the only adult present at the time of the injury; there is no evidence that anyone else was in the bathroom with K.P."). Thus, it is a reasonable inference that Tufts, who could have been the only one to cause the injury to Madison, was fully aware of the nature and severity of the injury.

The jury also had before it evidence that Tufts appeared to be attempting to build a defense in the wake of the injury by calling Greer and Torrie while frequently being more concerned with a narrative that Madison had been abused in Poland. And Tufts gave Greer the impression that he was less concerned for Madison's well-being and more concerned about how he would explain the injury to authorities. Also, multiple witnesses testified about Tufts's changing and implausible explanations for how Madison was injured and his changing stories about the amount of blood he had initially seen. Evidence of this behavior supports the jury's finding of guilt. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) ("[H]is inconsistent statements and implausible explanations indicate guilt, and that additional evidence supports the jury's finding of guilt.").

51

We conclude that a rational factfinder could have found beyond a reasonable doubt that Tufts intentionally or knowingly failed to seek medical attention for Madison and that this omission caused serious bodily injury to her. We overrule Tufts's first issue.

### 4. Count II: Injury to a Child by Contact

In his second issue, Tufts challenges the sufficiency of the evidence to support his conviction on Count II. That count alleged that "on or about August 9, 2016," Tufts intentionally or knowingly caused bodily injury to Madison "by grabbing [her] with [his] hand, by squeezing [her] with [his] hand, by striking [her] with an unknown object or by causing [her] to strike an unknown object." *See* Tex. Penal Code Ann. § 22.01(a)(3). The bodily injuries upon which the State relies to support Tufts's conviction on Count II are the numerous bruises found in various stages of healing that Madison had all over her body. Tufts contends the evidence is insufficient to support a finding that he knowingly or intentionally caused those bruises by any act alleged in the indictment.

There was evidence that, by the time Madison made it to the hospital on August 11, 2016, she had numerous bruises all over her body in various stages of healing. Teoh, Thornhill, Coffman, and Gabby all testified that Madison had these bruises. Coffman testified that Madison had a bruise to the bridge of her nose and facial bruising near her temple and cheek area. Coffman said that the injury would not have occurred by falling or flopping around in a bathtub. Thornhill said that this type

52

of injury was consistent with being struck by someone. Madison also had a bruise to her ear, another bruise that Thornhill averred was consistent with someone having struck Madison and which Coffman described as an impact injury.

Much like in the analysis above, Tufts also gave implausible and varying stories about the cause of the bruises and even appeared to have been attempting to create a defense for why Madison had the bruises. For example, Tufts told Greer about the bruises on August 10, explaining how the night before, Madison had called out that she had hit her eye (an area that contained a bruise that multiple witnesses said appeared to be the product of abuse) because she had run into her nightstand. Tufts also maintained that Madison had fallen and flailed around in the bathtub. But again, multiple witnesses testified that Madison's falling in the tub could not have caused the bruising. Additionally, there is some evidence in this record, namely Bearden's testimony, that incriminating evidence was concealed. Indeed, both Tufts's and Gabby's phones had either been reset or call logs had been deleted. These implausible stories, concealment of evidence, and inconsistent explanations for the bruises are evidence supporting the jury's verdict of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.").

We hold that the jury could have found beyond a reasonable doubt that Tufts intentionally or knowingly caused bodily injury to Madison by grabbing her with his

hand, by squeezing her with his hand, by striking her with an unknown object, or by causing her to strike an unknown object. *See Queeman*, 520 S.W.3d at 622. We overrule Tufts's second issue.

## B. Madison's Competency

In his third issue, Tufts argues that the trial court erred by finding Madison competent to testify at trial. Specifically, Tufts argues that the trial court failed to inquire whether Madison understood "that some penalty is attached when the truth is not told."

### 1. Law of Competency and Standard of Review

Generally, every person is presumed competent to testify. Tex. R. Evid. 601(a); *Hogan v. State*, 440 S.W.3d 211, 213 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). However, a person, such as a child, is not competent to testify if, upon examination by the trial court, the court finds that the person "lacks sufficient intellect to testify concerning the matters in issue." Tex. R. Evid. 601(a)(2); *Torres v. State*, 424 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Hogan*, 440 S.W.3d at 213. Moreover, "[b]efore testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience." Tex. R. Evid. 603.

We review a trial court's determination of whether a child witness is competent to testify for an abuse of discretion. *Davis v. State*, 268 S.W.3d 683, 696 (Tex. App.—Fort Worth 2008, pet. ref'd). We review the child's responses to qualification questions as well as the child's entire testimony. *Id.* When a defendant challenges the competency

54

of a child witness, the trial court must be assured that the child has (1) the ability to intelligently observe the events in question at the time of the occurrence, (2) the capacity to recollect events, and (3) the capacity to narrate the events. *Id.* at 699.

### 2. Madison's Testimony

Prior to her testimony, the trial court asked Madison whether she knew the difference between the truth and a lie. Although Madison initially replied, "No," she did acknowledge that she knew how to tell the truth, and she said multiple times that when she answered the attorneys' questions she would tell the truth. She was also able to answer specific questions from both the trial court and the prosecutor where she identified when both had said something untruthful. Specifically, the trial judge asked Madison whether it was the truth or a lie if he said he was "a big purple elephant right now?" Madison said that the statement was a lie. Outside the jury's presence, the prosecutor asked Madison whether her suit—which was black—was blue, to which Madison said, "No." The prosecutor then asked Madison that if she said she was wearing a blue suit, whether that would be "a lie or a truth?" Madison responded, "A lie." Madison also assured the prosecutor that she would truthfully answer any question the attorneys posed of her. Thus, even though Madison could not define "the truth" or "a lie," she demonstrated that she otherwise comprehended the need to tell the truth. *See Upton v. State*, 894 S.W.2d 426, 429 (Tex. App.—Amarillo 1995, pet. ref'd) ("More importantly, whether the minor can define such terms as 'truth' or 'lie' is unimportant if he otherwise comprehends the need to be truthful.").

Madison also demonstrated that she had the ability to observe the events in question at the time of the doll incident. She testified that she had previously lived in Texas and had been in the hospital because she had been hurt by a doll in Tufts's home. And she was able to recall and narrate the doll incident by averring that once she got out of the shower, Tufts hurt her "bum" with a doll. Thus, the trial court had evidence that Madison satisfied the three factors above. *See Davis*, 268 S.W.3d at 699.

Tufts argues that because Madison was unable to recall certain details about the home she lived in when the doll incident occurred and because she did not initially make an outcry against Tufts, she inherently was incompetent to testify at trial. But as Thornhill testified, it is not uncommon for children to not tell who abused them right away for various reasons, including fear or having been threatened. *See Kamanga v. State*, 502 S.W.3d 871, 875 (Tex. App.—Fort Worth 2016, pet. ref'd) ("The forensic interviewer testified that a 'rolling outcry,' where children say less initially than they eventually say, is common for abused children."). Inconsistencies in a child's testimony do not automatically render her incompetent to testify; instead, they may simply affect her credibility. *Torres*, 424 S.W.3d at 255.

While conceding that he is basically relying on former rules and cases based on those former rules, Tufts nonetheless also argues that what was fatally missing before the trial court in this case was any expression by Madison that she understood her moral obligation to tell the truth or in some way there was a penalty for not telling the truth. This court has previously rejected the argument that a trial court is required to question

56

"a child on the child's understanding of the punishment that will be inflicted should . . . she lie." *Davis*, 268 S.W.3d at 699. Under the current Texas Rules of Evidence, there is a presumption that a person is competent to testify, and the burden to show incompetence is on the party seeking to exclude the witness. *Gilley v. State*, 418 S.W.3d 114, 120–21 (Tex. Crim. App. 2014). Tufts did not carry that burden at trial. And Tufts also improperly relies on the *Gilley* court's acknowledgment that the language of former Article 38.06 of the Texas Code of Criminal Procedure was not carried over into the current Rules of Evidence, but that a trial court "may" still inquire that a child understand the obligation of the oath. As can easily be understood from reading *Gilley*, such questions by the trial court are purely discretionary. *Id.* We overrule Tufts's third issue.

## C. Admissibility of Madison's Outcry Statements

In part of his fourth issue, Tufts argues that the trial court erred by allowing Xenia to testify about what Madison had said that Tufts had done to her. Specifically, Tufts argues that these statements[6] constituted impermissible hearsay and bolstering. The State argues that the trial court properly admitted the testimony as a prior consistent statement and that Tufts has failed to preserve a bolstering argument for our review. We agree with the State.

---

[6]Although Xenia testified to a number of outcry-like statements that Madison had made to her, the only statements that Tufts challenges in his brief are when Madison told Xenia that "Daddy stuck Elsa in my booty, and Daddy is a mean man" and when Madison also said that her "bum got hurt with a doll . . . by [Tufts]."

57

### 1. Standard of Review

We review the trial court's admission of evidence for an abuse of discretion. *Allen v. State*, 202 S.W.3d 364, 367 (Tex. App.—Fort Worth 2006, pet. ref'd) (op. on reh'g); *see Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex. Crim. App. 1991) (op. on reh'g). Under this standard, the trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement" and is correct under any theory of law applicable to the case. *Alami v. State*, 333 S.W.3d 881, 889 (Tex. App.—Fort Worth 2011, no pet.); *Karnes v. State*, 127 S.W.3d 184, 189 (Tex. App.—Fort Worth 2003, pet. ref'd).

### 2. Prior Consistent Statement

Before a prior consistent statement becomes admissible, five requirements must first be met under Texas Rule of Evidence 801(e)(1)(B): (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent; (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; (4) the prior consistent statement must be offered to rebut an express or implied charge of recent fabrication; and (5) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007); *Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd). "The rule sets forth a minimal foundation requirement of an implied or express charge of fabrication or improper motive." *Hammons*, 239 S.W.3d at 804. This minimal

foundation requires only a suggestion that a witness consciously altered her testimony. *Id.*

The trial court must look at the totality of the cross-examination in determining whether recent fabrication was implied. *Id.* at 808. Merely questioning a witness's credibility does not equate to a charge of recent fabrication. *Id.*; *Bosquez*, 446 S.W.3d at 586. Nevertheless, depending on the tone and tenor of the questioning, the cross-examiner's demeanor, facial expressions, pregnant pauses, and other nonverbal cues, the benign questioning of credibility could subtly imply recent fabrication. *Hammons*, 239 S.W.3d at 808. An implication of fabrication can be solidified when looking at the trial as a whole—including voir dire, opening statements, and closing arguments. *Id.*; *Bosquez*, 446 S.W.3d at 585. A reviewing court should look at the purpose of the impeaching party, all the circumstances, and the trial court's interpretation of the implication. *Hammons*, 239 S.W.3d at 808.

At trial, the State pointed to this exchange between defense counsel and Madison as evidence the defense had implied that Madison had fabricated her testimony:

Q:   Okay. Do you remember [the prosecutors] coming up to Utah to see you in – last summer?

A:   I'm confused.

Q:   Okay. Do you remember Lauri and Rick? You said you know who Rick is, right?

A:   Yeah.

Q:   How many times have you met them before?

59

A:     I've only met Lauri once, and then I only met Rick once.

Q:     Okay.  And was that here in Texas, or was that up in Utah?

A:     Up in Utah.

Q:     Okay.  And do you remember talking to other people about what happened in the shower?

A:     Yes.

Q:     Okay.  Did you talk to a lot of people about what happened in the shower?

A:     Not a lot.

Q:     Okay.  More than five times, do you think you talked about what happened in the shower?

A:     It was more than five times.

In this case, Madison testified at trial and was subjected to cross-examination. And when looking at the trial as a whole, there was an express or implied charge of recent fabrication or improper influence.  Indeed, during opening arguments, defense counsel argued to the jury that Madison had not previously made any allegations against Tufts until after she moved in with Xenia and that is "when these allegations changed, when these ideas were put into [Madison's] head."  Given that foundation, the implication that Madison had not discussed what happened in the shower with very many people other than the prosecutors was a suggestion that Madison consciously altered her testimony and fabricated it because of the prosecutors' influence.  Thus, the State offered Xenia's testimony to show that Madison had in fact made a consistent

statement previously that Tufts is who harmed her in the shower with the doll, as she had done in her testimony.

Tufts argues that Madison's statement was not shown to be made before she would have had a motive to fabricate her testimony. But the statements made to Xenia were made prior to Madison moving to Utah and living with Amy and Glenn. Thus, her statements made to Xenia were made prior to the prosecutors visiting Madison in Utah when they would have allegedly influenced Madison to alter her testimony in preparation for trial. *See Hammons*, 239 S.W.3d at 808. We overrule this portion of Tufts's fourth issue.

### 3. Bolstering Argument Not Preserved

In the remainder of Tufts's fourth issue, he argues that the trial court improperly allowed the State to bolster other evidence through Xenia's testimony. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013); *Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000).

Here, Tufts did not object to Xenia's testimony about what Madison told her based on a bolstering objection. Thus, he has failed to preserve this portion of his

fourth issue for our review.  *See* Tex. R. App. P. 33.1(a)(1).  We overrule Tufts's fourth issue entirely.

## D.  Double Jeopardy

In his fifth issue, Tufts argues that he was "improperly assessed two sentences under Counts I and III as punishment for the 'same offense' within the meaning of the Fifth Amendment," and thus his double jeopardy rights have been violated.  The State counters that Tufts has failed to preserve this issue for our review or, alternatively, that there is no double jeopardy violation.  We agree with the State.

### 1.  Preservation of Double Jeopardy Claim

As a general rule, a party must preserve a complaint for appellate review by making a timely and specific objection, motion, or request in the trial court.  *See* Tex. R. App. P. 33.1.  A potential multiple-punishment double jeopardy claim may be forfeited if the defendant does not properly preserve the claim by raising it in the trial court. *Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006); *Gonzalez v. State*, 8 S.W.3d 640, 642–43 (Tex. Crim. App. 2000).  Requiring the defendant to preserve his multiple-punishments double jeopardy claim allows the trial court and the prosecution the opportunity to remove the basis for the objection and avoid the risk of an unnecessary retrial. *Langs*, 183 S.W.3d at 686 n.22 (quoting *Gonzalez*, 8 S.W.3d at 645–46).

A defendant may, however, raise a double jeopardy claim for the first time on appeal when the undisputed facts show that the violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no

legitimate state interest. *Gonzalez*, 8 S.W.3d at 642–43. A double jeopardy claim is apparent on the face of the trial record if resolution of the claim does not require further proceedings to introduce additional evidence in support of the claim. *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013); *Gonzalez*, 8 S.W.3d at 643.

As he concedes in his brief, Tufts did not raise a double jeopardy objection in the trial court. Instead, he argues that his double jeopardy claim does not require preservation because the violation is clearly apparent on the face of the record. We disagree.

As mentioned above, injury to a child is a result-oriented offense. *See Williams*, 235 S.W.3d at 750; *Villanueva v. State*, 227 S.W.3d 744, 748 (Tex. Crim. App. 2007). This means that the child's injury forms the allowable unit of prosecution. *Villanueva*, 227 S.W.3d at 748. "If the focus of the offense is the result—that is, the offense is a 'result of conduct' crime—then different types of results are considered to be separate offenses, but different types of conduct are not." *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008). A defendant may be held criminally responsible for failing to seek medical care for a child's underlying injury if the failure to seek care resulted in "separate and discrete, or at least incrementally greater" injury to the child. *Villanueva*, 227 S.W.3d at 749. Consequently, whether separate legal theories are separate offenses depends upon whether the theories differ with respect to the result of the defendant's conduct. *Huffman*, 267 S.W.3d at 905.

Here, the face of the record does not show a clear double jeopardy violation. Rather, Counts I and III related to two types of injury to Madison—that is, the counts alleged conduct that led to different results. Count I charged Tufts with violating the injury-to-a-child statute by "penetrating the sexual organ and/or anus of [Madison] with a doll or an unknown object." Count III charged Tufts with violating the injury-to-a-child statute by "failing to seek medical attention in a timely manner, and [Tufts] had a legal duty to act, namely, as a parent or legal guardian." Thus, Count I charged Tufts with the result-oriented offense of causing the injury by the use of the doll or object, and Count III charged Tufts with the separate, result-oriented offense of causing injury by failing to seek medical attention and the additional injuries she suffered from that delay.

We conclude that Tufts is not permitted to raise his double jeopardy claim in this appeal because he did not preserve it in the trial court, and he failed to show a double jeopardy violation is apparent on the face of the record. *See Avalos v. State*, Nos. 01-18-00329-CR, 01-18-00330-CR, 2019 WL 386429, at *3 (Tex. App.—Houston [1st Dist.] Jan. 31, 2019, pet. ref'd) (mem. op., not designated for publication) (holding that appellant failed to preserve double jeopardy claim for two convictions for injury to a child where indictments related to injury to a child resulting in two different, discreet injuries).

## 2. No Double Jeopardy Violation

But even assuming that Tufts could bring his double jeopardy claim for the first time on appeal, we conclude that there is no double jeopardy violation in this case. It is true that the State charged Tufts with and tried him for both causing bodily injury to Madison via the doll incident (Count I) and by omitting to seek medical care for her after her injuries from the doll were apparent (Count III). Similarly true is that the Texas Court of Criminal Appeals has held "that the Legislature intended that serious bodily injury committed against the same victim at the same time should be considered the same offense for purposes of the double-jeopardy prohibition against multiple punishments regardless of whether that injury to that victim resulted from the actor's act, his omission, or by a combination of his act and omission." *Villanueva*, 227 S.W.3d at 748. In so concluding, however, the *Villanueva* court distinguished the circumstances before it from those in another of its opinions, *Luna v. State*, 493 S.W.2d 854, 859 (Tex. Crim. App. 1973). *Id.* at 748–49. According to the *Villanueva* court, *Luna* stood for the proposition that a defendant could lawfully be convicted for "two violations of the same statutory provision on the same day, so long as the State can prove that two separate and discrete incidents occurred on that day comprising two violations of the same statutorily defined offense." *Id.* As the *Villanueva* court opined:

> Had [Villanueva] continued to prevent Legg from taking G.V. to the hospital on the morning of July 30th, when G.V.'s condition was obviously deteriorating and it was apparent that he might suffer further serious bodily injury absent medical intervention, we think that the principle in *Luna* could well apply. Under those hypothetical

65

circumstances, it could reasonably be said that the failure to seek treatment for G.V.'s apparent injuries resulted in a *separate and discrete, or at least incrementally greater, injury* for which [Villanueva] could also be held criminally accountable without violating double jeopardy. But here we can point to no omission that caused any injury beyond that which the appellant had caused by his act.

*Id.* at 749 (emphasis added).

Therefore, a defendant is not automatically exposed to double jeopardy simply because he is charged with causing serious bodily injury to a child by an act and by omission. *See id.* Where the act caused an initial injury and that injury was made greater by later denying the child medical treatment, two discrete offenses may indeed exist permitting their prosecution without hindrance from the double jeopardy prohibitions. *See id.*

This case serves as the perfect illustration of this concept. Tufts caused Madison to suffer a serious bodily injury via the doll incident. Tufts then opted to forgo medical treatment for Madison for two days. Multiple medical professionals testified that Tufts's decision to forgo medical treatment for Madison theoretically caused greater trauma to her, placed her in danger of death, and caused the need for a colostomy—a separate, discrete injury from the injury that occurred from the doll incident. *See id.* We hold that, given the record before us in this case, Tufts's double jeopardy rights were not violated by the State having charged him with injury to a child by act in Count I and, separately, injury to a child by omission in Count III. *See id.* (explaining that a defendant could be held criminally responsible, without violating double jeopardy, for

"a separate and discrete, or at least incrementally greater, injury" resulting from a separate or additional act beyond the initial act); *Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) ("Separate crimes of aggravated assault could be based upon separately inflicted instances of bodily injury."). We overrule Tufts's fifth issue.

## E. Stacked Sentences

In his sixth issue, Tufts argues that the trial court erred by ordering that his sentence for Count III commences only once the sentence in Count I concludes. In other words, Tufts complains that the trial court stacked the jury-imposed sentences for Count I and Count III.[7] Specifically, Tufts argues that the trial court erred "because: (1) the jury considered the transactional nature of the offenses in its determination of the appropriate punishment; (2) the trial court made no findings to show a need for increased punishment; (3) [Tufts] is punished more than once for the same offense; and (4) the resulting confinement became cruel and unusual under the Eighth Amendment." We disagree.

### 1. Standard of Review

We review a trial court's decision to "stack" or cumulate sentences for an abuse of discretion. *See* Tex. Code Crim. Proc. Ann. art. 42.08(a); *Beedy v. State*, 194 S.W.3d 595, 597 (Tex. App.—Houston [1st Dist.] 2006), *aff'd*, 250 S.W.3d 107, 115 (Tex. Crim.

---

[7]The trial court ordered that the sentence imposed in Count II run concurrently with the sentence imposed in Count I.

App. 2008); *Nicholas v. State*, 56 S.W.3d 760, 765 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Under Article 42.08 of the Texas Code of Criminal Procedure, the trial judge has the discretion to cumulate the sentences for two or more convictions. Tex. Code Crim. Proc. Ann. art. 42.08(a). An abuse of discretion will generally be found only if: (1) the trial court imposes consecutive sentences when the law requires concurrent sentences, (2) the trial court imposes concurrent sentences when the law requires consecutive ones, or (3) the trial court otherwise fails to observe the statutory requirements pertaining to sentencing. *Nicholas*, 56 S.W.3d at 765.

## 2. Applicable Law

Aside from certain statutorily-defined exceptions, when an "accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced . . . [and] the sentences shall run concurrently." Tex. Penal Code Ann. § 3.03(a). Section 22.04 of the Texas Penal Code defines the offense of injury to a child. Tex. Penal Code Ann. § 22.04(a). Tufts was convicted under Section 22.04(a)(1) as to Counts I and III. *Id.* § 22.04(a)(1). Section 3.03(b) specifically allows consecutive sentencing when, as in this case, an accused is found guilty of more than one offense arising out of the same criminal episode for an offense under Section 22.04(a)(1). *See id.* § 3.03(b)(6)(A).

"Criminal episode" means the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person, when

68

(1) the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan or (2) the offenses are the repeated commission of the same or similar offenses. *See id.* § 3.01. Section 3.01 "does not require that all the offenses arising out of the same criminal episode occur within any particular time frame." *Casey v. State*, 349 S.W.3d 825, 831 (Tex. App.—El Paso 2011, pet. ref'd); *see* Tex. Penal Code Ann. § 3.01.

### 3. Analysis

Regarding Tufts's contention that the "jury considered the transactional nature of the offenses in its determination of the appropriate punishment," his argument is similar to his contention in his fifth issue that he was "prosecuted for the same offense under Counts I and III"; thus, the stacking provisions of Section 3.03 do not apply. But as discussed above, the offenses that Tufts was found guilty of in Counts I and III are separate, result-oriented offenses. *See Huffman*, 267 S.W.3d at 905. We reject this argument by Tufts.

As to the trial court's alleged failure to make a finding showing the need for increased punishment, as the State points out, Section 3.03 "does not specify an evidentiary burden to trigger the court's authority to cumulate sentences." *See Bonilla v. State*, 452 S.W.3d 811, 816 n.22 (Tex. Crim. App. 2014) (citing *Dale v. State*, 170 S.W.3d 797, 801 n.2 (Tex. App.—Fort Worth 2005, no pet.)). Therefore, the trial court was not required to make a finding showing a need to stack Tufts's sentences.

Even though Tufts describes his third complaint under this issue as having been convicted for the same offense under Count I and III, it appears as though Tufts is arguing that the single "criminal episode" provision of Section 3.03 was not met in this case. Here, the offenses charged in Count I, injury to a child causing serious bodily injury, and Count III, injury to a child by omission, are similar offenses, thus they constitute same or similar offenses. *See* Tex. Penal Code Ann. §§ 3.03, 22.04(a)(1). Because these two convictions meet the requirements under Section 3.03, the trial court had the discretion to order them to run consecutively. *See id.* § 3.03(b)(6)(A).

Finally, regarding Tufts's contention that the trial court's stacking of sentences equates to cruel and unusual punishment, as a general rule, punishment that is assessed within the statutory range for an offense is neither excessive nor unconstitutionally cruel or unusual. *See Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). Both sentences imposed by the jury fall within the statutory range for the offenses charged in Counts I and III. *See* Tex. Penal Code Ann. §§ 12.32(a), 22.04. And Tufts has not demonstrated why this general rule should not apply nor how the sentences assessed by the jury in this case were excessive, grossly disproportionate to his crimes, or unconstitutionally cruel or unusual. Nor has he shown how the trial court's discretionary act of stacking the properly assessed punishments is cruel and unusual.

Tufts's sixth issue also seems to contain an argument that the trial court usurped his choice to have the jury assess punishment by stacking the sentences. Although Tufts does not specifically state that he is attacking the constitutionality of Texas Code of

70

Criminal Procedure Article 42.08, which grants the trial court the discretion to stack sentences, that appears to be his argument. Tex. Code Crim Proc. Ann. art. 42.08. Tufts did not challenge the constitutionality of Article 42.08 in the trial court; thus, to the extent he is attempting to allege a facial challenge to the constitutionality of Article 42.08, he has forfeited that argument for our review. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009). Furthermore, to the extent that Tufts brings a challenge to the constitutionality of Article 42.08 that did not need to be raised in the trial court, he has failed to carry his burden to overcome the presumption this court is to make that a statute is constitutional and the legislature has not acted unreasonably or arbitrarily. *See Luquis v. State*, 72 S.W.3d 355, 365 n.26 (Tex. Crim. App. 2002) (citing *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978)). We overrule Tufts's sixth issue.

## IV. CONCLUSION

Having overruled all six of Tufts's issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020

71